24 97



# THE ATTORNEY GENERAL
# OF TEXAS

### AUSTIN 11, TEXAS

WILL WILSON
ATTORNEY GENERAL

June 19, 1958

Honorable William A. Harrison      Opinion No. WW-459
Commissioner of Insurance
State Board of Insurance      Re: What constitutes an under-
Austin, Texas                      writing transaction pro-
                                     hibited by Article 3.39,
                                     Section 2 of the Texas
Dear Sir:                                Insurance Code?

       In your amended opinion request you ask whether several types of transactions are prohibited by various provisions of the Insurance Code among which is Article 3.39, Section 2, which reads as follows:

> "No such company shall subscribe to, or partici-
> pate in, any underwriting of the purchase or sale of
> securities or property or enter into any such trans-
> action for such purpose, or sell on account of such ·
> company jointly with any other person, firm or corpora-
> tion; nor shall any such company enter into any agree-
> ment to withhold from sale any of its property, but
> the disposition of its property shall be at all times
> within the control of its Board of Directors; . . ."

       The first two of the factual transactions that you are concerned with are summarized from our correspondence as follows:

       1. A contract between a life insurance company and a subdivision development company provides as follows:

> "Whereas, it is contemplated and agreed that
> the XYZ Life Insurance Company and the B Investment
> Company will build or cause to have built for sale
> a number of ·residences both in Odessa, Texas, and
> Irving, Texas, to be jointly owned by both corpora-
> tions, and that the title to the property shall be
> carried in the name of the B Investment Company for
> convenience only.
>
> "Now, therefore, be it resolved that the XYZ
> Life Insurance Company shall furnish all of the money
> through loans or provide the necessary credit .to the
> B Investment Company for the purchase of the building
> sites, materials, labor and all building construction

costs; that the B Investment Company will furnish
all of the supervision, let all contracts for
building on a basis satisfactory to the XYZ In-
surance Company and will supervise the sale of said
houses. When the houses are sold all the profits,
after deducting the entire cost of lots and build-
ing plus any commissions paid for sale of property
or any expenses of any nature incurred in the build-
ing of said houses, shall be divided as follows:

"85% to the XYZ Life Insurance Company.

"15% to the B Investment Company.

"In arriving at the cost it is understood that
the interest paid on the money borrowed shall be a
part of the costs determining the profit."

2. A development corporation under a trust agreement
deeds fee title to real estate for subdivision to a Trustee
under an escrow arrangement whereby a life insurance company
loans the Trustee large sums of money secured by a first lien
upon the real estate contributed by the development corporation.
These funds held by the Trustee are advanced from time to time
to the development corporation to build and develop the sub-
division. As the subdivision is developed and sold to the
public, the entire proceeds are deposited with the Trustee.
The Trustee in turn uses a percentage of these total proceeds
(agreed to in the trust instrument) to pay off the indebtedness
to the life insurance company. After the loan plus interest is
paid off to the insurance company, the Trustee then distributes
the profits between the insurance company and the development
corporation according to a formula agreed to in the trust in-
strument.

An "underwriting of the purchase or sale of . . .
property" would consist of a promise by the insurance company
that if property were not sold for a certain price it would
guarantee that the insurance company would buy it for that price.
Or conversely, unless property could be acquired at a certain
price the insurance company would acquire the property for the
guaranteed price whatever the market price might be. (See 43
Words and Phrases, p. 124, et seq.) Thus, it is evident that
neither of the two above questioned transactions resembles a
prohibited underwriting transaction.

It is our opinion, however, that both of these trans-
actions are prohibited on other grounds. The above quoted portion
of Section 2 which contains the restrictions on underwriting and

joint accounts was not in the Texas law until 1909. The historic Armstrong Committee reported on February 22, 1906, to the New York State Legislature concerning the wide scale abuses by the management of New York insurance companies. The Committee found that the large companies had furnished their support to numerous speculative financial ventures through participating in the underwritings of syndicates. In this manner, purchases had been made, not for investment, but for resale. See Examination of Insurance Companies, Volume 2, by the New York State Insurance Department, New York, 1953, p. 244, et seq. Often companies furnished all the money required for the speculative venture while officers of the company and members of the finance committee would be parties to a joint account and share in its profits. In order to eliminate these wide scale abuses the fifth recommendation of the Armstrong Committee was as follows:

"The statute should also forbid all syndicate participations, transactions for purchases and sales on joint account, and the making of any agreement providing the company shall withhold from the sale at any time, or subject to the discretion of others, any securities which it may own or acquire."

This recommendation was adopted by the Legislature of New York on April 27, 1906, as a part of Section 100, Laws of New York, ch. 326, p. 798 (1906). This section is almost identical word for word with the above quoted Texas provision originally enacted in 1909 and brought unchanged into the Texas Insurance Code as Article 3.39, Section 2.

From this statutory history, it is clear that the quoted phrase of Article 3.39, Section 2, establishes three distinct and separate restrictions on all types of investments: First, prohibiting underwriting; second, prohibiting sales on joint accounts and, third, prohibiting the placing of the insurance company's property beyond the control of its Board of Directors. The evil sought to be remedied by the prohibition of selling on joint accounts was transactions of the nature of partnership or joint ventures for a speculation in property by which others than the insurance company would share some control or the profit or loss of such an "investment".

The profit sharing features of the first transaction outlined above are clearly within this prohibition. Both the first and second transactions are essentially sales of property on joint account with another person, firm or corporation, in which the insurance company puts up the money in a joint account to finance the development and resale of property. In both instances the insurance company is to receive not only the loan

money back with interest but then it will also share in the profits with the developer. The profit sharing feature as a bonus is prohibited. Such a transaction is characteristic of some form of joint venture rather than an ordinary loan upon first liens upon real estate. The first transaction is further defective for the reason that title to the real estate is in the insurance company and thus would be forbidden by Article 3.40.

The statute itself provides that: "A life insurance company organized . . . may invest in or loan upon the following securities, and none others, viz: . . ." (Emphasis ours) In this connection it should be noted that these transactions involve property acquired for speculative resale rather than loans or investments that are held for their yield in the form of interest or dividends. The acquisition of such property for speculative resale is not authorized by Article 3.39 and therefore ultra vires.

The third factual situation on which you request an opinion as to whether or not it is a prohibited transaction is stated by you as follows:

> 3.    A "life insurance company . . . issued shares of its stock to a subsidiary underwriting corporation with an agreement that the underwriting corporation would sell the shares of stock to the public, and that all profits over and above 30% of the realized gross profit on the sale of the stock would be contributed by the underwriters corporation to the life insurance company as surplus."

This third transaction by which a corporation acts as an underwriter upon shares issued to it by an insurance company is somewhat anomalous. For a small consideration the under-writing corporation only commits itself to use its best efforts to market the insurance company's securities. The insurance company is not itself acting as an underwriter. Certainly, however, if the insurance company were to participate in such an arrangement concerning stocks other than that of its own issue, it would be participating in an underwriting transaction which would be clearly forbidden. However, taken in context, the statutory underwriting prohibition applies only to invest-ments by life insurance companies. In the instant case there is no investment by the insurance company in any sense when the insurance company attempts to market its own securities anymore than when it attempts to sell its own policies. For this reason we do not feel that the above quoted restrictions of Article 3.39, Section 2, apply to this transaction. We have assumed under the facts of this transaction that the underwriting corporation was acting as a disinterested underwriter in an arms length

transaction. However, if the Board should ascertain that the directors in the insurance company are "pecuniarily interested in" the underwriting subsidiary corporation, then it is the Board's duty to subject to the strictest scrutiny the underwriting contract with the subsidiary corporation. From the legislative history as stressed in the Armstrong Committee Report, it is abundantly clear that any self dealing on the part of the directors is prohibited. Insurance Code, Article 3.67, Article 1.15 (formerly Articles 4727 and 4690) were construed in Attorney General Opinion O-1889 to allow the Board to revoke or modify any certificate of authority issued if a suspect transaction fails to meet the test of fairness, fiduciary relationship, and the standards of soundest morality. It should be noted in this regard that the retention of a thirty (30%) percent commission by the underwriting corporation may well be a violation of The Securities Act which limits the total expenses of marketing securities including commission. The commission retained by the underwriting subsidiary corporation may exceed the maximum of twenty (20%) percent of the price at which the stock was sold to the public if the "price" paid by the underwriting corporation to the insurance company were nominal. In summary, both the first and second transactions are sales of property on the account of the insurance company jointly with another person, firm or corporation and are clearly prohibited by Article 3.39, Section 2, as well as other sections of the Insurance Code. The third transaction, although it is not a prohibited underwriting transaction, may be a suspect on other grounds.

## SUMMARY

A transaction by which an insurance company advances capital for real estate development in return for a share of the profits is prohibited by Article 3.39, Section 2, Texas Insurance Code. An insurance company may utilize an underwriter in order to market its own securities unless the insurance company directors are so "pecuniarily interested"

in the transaction as to violate Article
3.67 of the Insurance Code.

Yours very truly,

WILL WILSON
Attorney General of Texas

By Maco Stewart

Maco Stewart
Assistant

MS:ph

APPROVED:

OPINION COMMITTEE:

Geo. P. Blackburn, Chairman

Leonard Passmore
Wayland C. Rivers, Jr.
Henry G. Braswell

REVIEWED FOR THE ATTORNEY GENERAL
BY:
    W. V. Geppert.